2022 IL App (2d) 200400-U
No. 2-20-0400
Order filed March 29, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-1566 |
| CARLOS F. LOPEZ, | ) ) ) | Honorable Donald M. Tegeler Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices McLaren and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's ineffective-assistance-of-counsel claim was rejected where defendant failed to establish prejudice from the alleged deficient performance. Defendant's 39-year sentence for first-degree murder was not an abuse of discretion. Affirmed.

¶ 2    Following a jury trial, defendant, Carlos F. Lopez, was convicted of first-degree murder and sentenced to 39-years' imprisonment. Defendant appeals his conviction and sentence. He raises an ineffective-assistance-of-counsel claim and challenges the length of his sentence. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Defendant was charged with first-degree murder for the August 12, 2017, stabbing death of Bayron Cruz-Garcia in the Elgin Industries complex on Jansen Farm Court in Elgin. The mother of defendant's two young daughters, Hortencia Rojas, was in a sexual relationship with the victim.

¶ 5                              A. Pretrial Proceedings

¶ 6    There was extensive pretrial litigation, including defendant's motion *in limine* to bar evidence regarding an outstanding domestic battery warrant at the time of his arrest in this case and that defendant "was not supposed to be at 260 Villa, Elgin Illinois," where Rojas and the children lived. The State agreed not to elicit the evidence unless defendant opened the door to its introduction. Defendant also unsuccessfully moved to suppress his videotaped statements to police.

¶ 7                              B. Trial

¶ 8    A four-day jury trial commenced on March 9, 2020. Witnesses included the investigating police officers, Rojas, accomplices Ivett Rodriguez and Gabriel Lopez (no relation to defendant and referred to herein as Gabriel), and defendant.

¶ 9    Elgin police officer Steve Alcorn testified that, on August 12, 2017, at about 1:54 a.m., he was dispatched to the industrial complex. Upon arrival, he found the victim lying on his back in the grass. The victim was shirtless with several puncture wounds in his chest and torso area, swelling to his eyes and lips, and blood on his body and face. The victim lifted his arm and moaned to draw Alcorn's attention. As Alcorn attempted to provide aid, the victim died.

¶ 10   Elgin police officer Doug Neff subsequently arrived. Neff obtained Elgin Industries's time-stamped surveillance footage of the area. The video was admitted into evidence and played for the jury. Neff testified that the video showed the arrival of a blue or silver Buick Rendezvous at 1:10 a.m. At 1:39 a.m., a maroon SUV arrived and parked. Thirteen minutes later, at 1:52 a.m. two

individuals, one wearing white shorts, walked toward the SUV. At 1:53 a.m., a third person ran toward the SUV. Three individuals then ran away from the SUV; the arrival and departure of the three people happened in less than one and a half to two minutes.

¶ 11    Rojas testified pursuant to a grant of use immunity; she was charged with obstruction of justice for lying to the police about this case. Rojas first testified regarding her relationship with defendant. On August 11, 2017, she neither lived with defendant nor was his girlfriend. Defendant occasionally gave her money to help support their daughters and sometimes provided child care. Approximately two weeks prior to the murder, defendant discussed with Rojas, on more than one occasion, his desire to resume their relationship, but Rojas rejected the proposition.

¶ 12    Rojas also testified regarding her relationship with the victim. In addition to being her boss at Cobra Metal Works in the Elgin Industries complex, the victim became her lover in April or May 2016. Rojas testified regarding an incident between defendant and the victim at Rojas's house in May 2016. Prior to the testimony, the trial court instructed the jury that the testimony was to be considered only as to the issues of defendant's intent and motive. Rojas proceeded to explain that, on the date of the 2016 incident, defendant had been at her house, but she told him to leave because she knew that the victim would be arriving. She thought defendant left, but defendant walked in on Rojas and the victim having sexual relations and started hitting the victim. After the victim left, defendant stated, "He can't even fight for himself, is that what you want from a man?"

¶ 13    Rojas further testified that, on August 11, 2017 (the day before the murder), at about 1:50 a.m., she accompanied defendant to the Carpentersville Walmart, where she purchased knives and a man's black hooded sweatshirt. Later that day, she told defendant that "he had to go to the house because [she] was going out to see [the victim]."

¶ 14    That night, at approximately midnight on August 12, 2017, Rojas drove defendant, in a red Ford Explorer, to a BP gas station in Elgin. Rojas testified that she and defendant were registered co-owners of the Explorer but did "[n]ot exactly" share the car. At the gas station, defendant got into another car but returned to the Explorer. Rojas then drove defendant to a bank where she withdrew money and gave the money to defendant. Rojas proceeded to drive defendant to "the house."

¶ 15    In addition, Rojas testified that, a couple of hours later, she saw the victim at the Elgin Industries parking area and explained that she and the victim "always" agreed to see each other there. Rojas parked her car and then texted the victim that she was there. Rojas testified that she did *not* text defendant that she was there and that defendant did not ask her to do so. When questioned as to her August 30, 2019, post-arrest statement, Rojas testified that she did not recall stating either that defendant asked her to text him when she met up with the victim or that she had deleted the text messages.

¶ 16    After Rojas texted the victim upon her arrival to Elgin Industries, the victim arrived at the parking area and got into her car. As Rojas and the victim proceeded to have sexual relations in the back seat of the car, a person opened the car door. The victim told Rojas to call the police, and then a different person opened the car door on the other side. The two people pulled the victim out of the car. Rojas testified that defendant was not one of the two people who opened the car doors. A third person arrived, and the three people beat up the victim. Rojas testified that she did not see anyone with a weapon. She also testified that she did not watch. Rojas explained that she did not lock the car doors "[b]ecause when you would lock the door and with the movement of the sex in the car, the alarm would go off."

¶ 17    After the three people left, Rojas "got out to see if [the victim] was okay." The victim was standing up and told Rojas to call the police and leave. Rojas called the police and gave them a fake name so that the victim's wife would not find out that he was with Rojas. Rojas testified that she neither saw the victim's condition nor waited for an ambulance's arrival.

¶ 18    Rojas was questioned about surveillance photographs of her and defendant at Walmart the night before the murder. With respect to a photograph of defendant at the checkout counter with a set of steak knives, Rojas testified that she paid for the knives and that there were four knives in the package. Rojas initially testified that she did not notice a missing knife after the incident. However, after being reminded of her August 30, 2019, interview with police, Rojas stated that she did not realize a knife was missing "until Monday" and stated that she did not throw the knife away. Rojas testified that she purchased the knives at Walmart in preparation for a birthday celebration for their daughter, who had requested grilled meat. Their daughter was turning seven over a month after the knife purchase. Evidence was introduced that, at the time of her August 30, 2019, interview with police, the content of her purse included a Walmart receipt for steak knives and a sweatshirt. Evidence established that three Farberware knives were recovered from Rojas's house at 260 Villa Street in Elgin on August 16, 2017.

¶ 19    Accomplice Gabriel testified next. He pled guilty to first-degree murder and received a 25-year sentence; he testified pursuant to a grant of use immunity. Gabriel testified that, on August 11, 2017, his girlfriend, Ivett Rodriguez, drove him to a house on Jay Street in Elgin to pick up Michael Giacomino, also known as "Snowman," and then drove them to a BP gas station, where they met defendant. Defendant told them that he would pay for their assistance that night in beating up someone who owed defendant money. Gabriel agreed, and they drove to a bank where

defendant withdrew money and gave Gabriel $200. Gabriel returned to Jay Street with Rodriguez and Giacomino, and defendant said he would contact him later that night.

¶ 20    Gabriel further testified that, a couple of hours later, at 12:30 or 1 a.m., Giacomino received a text message from defendant. Rodriguez took Gabriel and Giacomino back to the BP gas station, where defendant entered their car. At defendant's direction, they drove to where the victim worked. Defendant stated that his girlfriend already knew what was transpiring and would leave the car doors unlocked. Defendant told Gabriel and Giacomino to take the victim out of the car and beat him up. Defendant told Gabriel and Giacomino that he would give them half of the $3000 that the victim owed defendant.

¶ 21    When they arrived, the victim's car was not there, so they parked and waited. After 30 to 45 minutes, "[Defendant's] girl pulled up and he said to wait another ten minutes." After ten minutes, Gabriel and Giacomino got out and walked to the car. Gabriel testified that "[a]t first we didn't see anybody, and then after that, we pulled the door and the door was open like he said it was and we seen [defendant's] girlfriend having sex with the victim."

¶ 22    Gabriel pulled the victim out of the car and punched and kicked him; defendant and Giacomino also punched and kicked the man. Defendant, having seen his girlfriend having sexual relations with the victim, "went crazy." Gabriel did not have a knife and did not see if defendant had a knife. After "a little while," Gabriel and Giacomino ran back to the car, while defendant continued to beat up the victim. Defendant then ran back to the car. Gabriel confirmed that he was the individual in white shorts in the surveillance video and also identified Giacomino and defendant as the other individuals.

¶ 23    They all drove back to the BP gas station and dropped defendant off. Defendant gave them $200 or "maybe a little bit less" and said that he would call them the next day to give them more

money. Gabriel testified that he did not recall what else defendant said. At this point, a clip of Gabriel's August 15, 2017, recorded interview with police was played. In it, Gabriel related that, in the car after the stabbing, defendant said, "I finally got that bitch n\*\*\*." Gabriel testified that, the next day, he sent around 50 text messages to defendant "[t]elling him not to f\*\*\* around with [him]" and threatening to "whoop his ass" in an effort to collect the $1500. The text messages were introduced into evidence. Gabriel repeatedly asked defendant where the money was and told defendant, "I'm going to do like yesterday" and "Man bro ima f\*\*\* you up."

¶ 24    Gabriel initially told police that he knew nothing. He later told police that he "whooped somebody." At the time, he did not know that the victim died and had not seen a weapon. Gabriel initially signed an affidavit denying Giacomino's involvement but recanted the attestation when he pled guilty.

¶ 25    Rodriguez, Gabriel's girlfriend, also testified regarding the events on the day of the murder. Rodriguez was interviewed by the police three times after the murder. She denied knowledge of the offense and defendant's name in the first interview on August 13, 2017. The next day, she identified defendant but denied recognition of Giacomino in a six-person photo array. After being charged with first-degree murder, she was interviewed on September 20, 2017, and provided a proffer of additional information. Rodriguez ultimately pled guilty to obstruction of justice with an agreement to serve an 18-month prison sentence; she also pled guilty to first-degree murder with an agreement for dismissal of the charge upon cooperation with the State in this case.

¶ 26    Rodriguez testified that, on August 11, 2017, she drove Gabriel and "Snowman" to a BP gas station in her Buick Rendezvous. At the gas station, defendant pulled up next to them in another car. Defendant entered Rodriguez's car and told them that "he needed a job to be done as in like he needed somebody to beat up somebody because the victim owed him money." Defendant

returned to his car, and Rodriguez, Gabriel, and Snowman followed defendant and "his wife or girlfriend" to a bank. Defendant withdrew money and gave it to Snowman.

¶ 27 Rodriguez, Gabriel, and Snowman returned to the house on Jay Street. Rodriguez remained in the car, while Gabriel and Snowman "went back in the house to drink more." She did not go in the house because her ex-boyfriend was there with his new girlfriend. After a couple of hours, Gabriel and Snowman returned and woke Rodriguez, who had fallen asleep in her car. Rodriguez drove them back to the BP gas station per their instruction, where they picked up defendant. Defendant advised that "they were just going to beat [the victim] up because he owed him like $3,000, and then he was going to tell us where to go to." Defendant also said that his wife was going to be there and would distract the victim.

¶ 28 Rodriguez testified that she arrived and parked. Ten minutes later, another car arrived, and sometime later, Gabriel and Snowman got out. Before they exited, defendant showed Gabriel something, and Gabriel said, "[N]o, I'm not going to use that. I'm just going to use my hands." Gabriel and Snowman approached a red Explorer. Rodriguez did not see what they did. A few seconds or minutes later, defendant exited and went to the Explorer. Rodriguez then heard screaming. Gabriel and Snowman returned to her car, after which defendant returned to the car. Gabriel told Rodriguez to leave. They dropped defendant off somewhere and then went to a house where Gabriel and Snowman wanted to get drugs. Before they dropped off defendant, he told them, "[Y]ou guys better not tell nobody or you know what is going to happen."

¶ 29 The video-recording and redacted translated transcript of defendant's interview with detectives were admitted into evidence. Defendant initially claimed to be in Ohio at the time of the murder. He later claimed to be with men named Ricardo and Alberto and denied knowing anyone named Gabriel. He then admitted knowing "Snowman." After defendant was told that

Rojas was in custody, he stated that he was guilty and requested something to sign so that his daughters could return to their mother.

¶ 30    Defendant stated that he used to get jealous of Rojas's relationship with the victim but then he moved on and was in a new relationship. Defendant admitted that there was an incident, in that he went to "beat the shit" out of the victim. He said he went to where the victim worked, and "We beat the shit out of him and that was it." Defendant elaborated that a girl drove him and Snowman and another man there around midnight, and he sat in the back seat on the driver's side both ways. Upon arrival, they waited a while, and then they "just beat the shit out of him." Defendant knew that the victim worked nights and saw Rojas arrive. He knew the time to be there because Rojas had been together with the victim for a year and a half. Defendant told the two men with him that they should go beat up the victim, that he would give them $200, and that the victim owed him $3000. They exited the car, pulled the victim out of his car, and hit him. Defendant admitted stabbing the victim in the stomach and said that he threw the knife away in the river.

¶ 31    Text messages from defendant's cell phone were translated where necessary and admitted into evidence. On August 9, 2017, defendant texted Giacomino: "Remember when I tell you I have to hit someone can you go with me." On the night of the murder, August 12, 2017 at 12:29 a.m., defendant texted Giacomino: "U guys ready."

¶ 32    Forensic evidence established that Giacomino's palm print matched a latent palm print lifted from the passenger side rear quarter fender of Rojas's Ford Explorer. In addition, the parties stipulated that the victim was the source of a bloodstain recovered from the rear driver's side door armrest of Rodriguez's Buick Rendezvous.

¶ 33    The forensic pathologist who conducted the autopsy testified that the victim had multiple blunt and sharp force injuries and evidence of medical treatment. There were multiple stab and

incise wounds to his chest, back, buttocks, abdomen, left wrist, and right arm. The victim's spleen, kidney, and colon were aspirated, and there was bleeding under the scalp. There was a shoe print on the victim's head, which would have to have been made while the victim was on the ground. The pathologist opined that the cause of the victim's death was multiple stab and incise wounds with blunt force trauma as a contributing factor. The pathologist further opined that the victim was stabbed with a knife, which, because it went through muscles and the wrist, would have to be over three inches long and one-half to one inch wide.

¶ 34    Defendant testified on his own behalf. Defendant previously lived with Rojas but moved out of the residence nine months prior to the murder because of a "domestic issue." However, defendant testified that he visited Rojas three or four times a week and that he and Rojas maintained a sexual relationship.

¶ 35    At this point, outside the presence of the jury, the trial court ascertained that defendant pled guilty to domestic battery on November 11, 2016, and that there was a no-contact order in effect through November 30, 2017, prohibiting defendant's contact with Rojas. The trial court asked defense counsel if she understood that she had "opened the door to both the conviction for this and the fact that he was violating court orders." Defense counsel confirmed that she understood and that doing so was part of her trial strategy. The State orally moved to allow introduction of the evidence and cross-examination of defendant on the evidence. The trial court allowed the motion, stating: "You can get into the conviction. You can get into the date of the conviction. I will allow you to get into the [no]-contact order and I will let you get into the fact that he's obviously admitted that he had contact against a court order during the no[-]contact order. I don't want you to get into the facts of the offense."

¶ 36　　Defendant resumed his testimony, relating that he and Rojas had sex three or four times per week. They engaged in family activities together, and defendant cared for the children when Rojas was at work. Defendant kept personal belongings at the house, including clothes and a toothbrush. He had keys to the house, and Rojas gave him permission to come to the house. Defendant gave Rojas $200 or $300 on a weekly basis. They owned a red Explorer together.

¶ 37　　On cross-examination, the State elicited that the domestic issue defendant described was a conviction for domestic battery against Rojas to which he pled guilty on November 21, 2016. He did not recall the sentence or the no-contact order. However, he testified that he knew it was a violation of the law to have contact with Rojas during the 12-month period after pleading guilty and knew he was violating the law each time he visited her. He stated that he had to be there for his daughters.

¶ 38　　Defendant acknowledged that he had a knife when he went to Elgin Industries on August 12, 2017. He testified that he "wanted to tell [the victim] to not be with my wife. I wanted her back. That I wanted my daughters back and that he would please understand. He had his own family." Although Rojas was not defendant's wife, he spent nine years with her and their daughters and considered Rojas his wife. Defendant had known for a year that Rojas had chosen to have a relationship with the victim and thought that the victim was competing with him for Rojas's affection.

¶ 39　　Defendant did not remember stabbing the victim. Defendant had intended to talk to the victim, but when he opened the car door, "I went crazy. The woman I loved was having sex with him. I didn't think." Defendant testified that the other men went to the car first, but defendant pulled the victim out of the car. Defendant took the knife out of the front of his sweatshirt. When asked, "So by going crazy, you are talking about just stabbing and slashing with a knife?,"

defendant answered "Yes," adding that "I really don't know what happened." Defendant testified that no one else at the scene had a knife. He stated that the money he gave the two men was for gas.

¶ 40    On redirect examination, defendant explained that he brought two friends and the knife to the scene so that the victim would see that defendant was serious about staying away from Rojas. Defendant testified that, when he left the scene, the victim was standing next to the car.

¶ 41                    C. Jury-Instruction Conference

¶ 42    Relevant to our analysis is defense counsel's requested for the following second-degree murder instruction: "A mitigating factor exists so as to reduce the offense of first degree murder to the lesser offense of second degree murder if, at the time of the killing, the defendant acts under a sudden and intense passion resulting from serious provocation by the deceased. Serious provocation is conduct sufficient to excite an intense passion in a reasonable person." Defense counsel argued that the instruction was warranted based upon the evidence that defendant discovered Rojas in the act of infidelity, analogizing to discovery of adultery with the offender's spouse—a recognized category of serious provocation. Counsel further argued that the relationship between defendant and Rojas sufficed for purposes of the instruction, notwithstanding that they were not legally married. The State objected, arguing that defendant and Rojas were not legally married and that defendant was already aware of Rojas's sexual relationship with the victim.

¶ 43    Following extensive argument, the trial court ruled that a second-degree murder instruction based on adultery was not warranted under the facts of the case. Initially, the trial court pointed out that it was bound by the lack of any precedent expanding the definition of adultery beyond the spousal relationship. The trial court pointed out that, while defendant and Rojas had a lengthy relationship, sexual relations, and children together, they were not legally married. However, the

trial court emphasized that this was not the basis for its ruling. Rather, the trial court declined the second-degree murder instruction on the basis that there was no sudden and intense passion under the facts presented. Namely, the trial court reasoned that defendant had known about Rojas's relationship with the victim for a year. Indeed, defendant was having sexual relations with Rojas while knowing that she was having sexual relations with the victim. Given this knowledge, even an unexpected sight of Rojas and the victim having sexual relations could not give rise to a sudden and intense passion. Accordingly, the trial court denied defense counsel's proposed second-degree murder instruction and all proposed jury instructions incorporating the second-degree murder instruction.

¶ 44                                D. Closing Arguments

¶ 45     Relevant to our analysis is defense counsel's closing argument. Counsel argued that the State failed to prove intent to kill or cause great bodily harm or knowledge that such was a strong probability. Counsel specified that, if defendant had planned the murder, he would not have brought witnesses; the blood evidence on the cars would have been washed away; the text messages would have been deleted; the Walmart receipt would not have been retained; defendant would have bought a gun; and defendant would have fled.

¶ 46     Counsel elaborated:

"Did he know that he caused death or great bodily harm? Let's think about the relationship. You heard it. They met when [defendant] was 19 and they have two daughters and they were maybe not married but they spend time together, they raise the kids together, they shop, eat, they share a car. It is co-owned. They are co-owners. You know, there are many reason[s] people don't go to the county and register, but they are considered [by] each other as husband and wife.

Yes, in 2016, there is some domestic issue that he had to move out. But like he said, yeah, I know, I'm not supposed to be with her but the girls need me. And based on [Rojas's] testimony and his testimony, they are still having consensual sex and they are meeting together.

He has a key. And you actually have a video that they went to Walmart and shopped together. I know it is odd hours, 1:50 a.m., but if you consider [Rojas's] work hours is midnight shift and he's there and she pays. She pays.

So [Rojas] is still having a relationship with [defendant]. And I know the state's attorney says that's the revenge part that he's humiliated that she's having sex, but in [defendant's] mind, they are back together. If they are doing all of that, living together, babysit the girls, that is his wife, that's [his] babies' mama."

¶ 47    Counsel argued that defendant went to confront the victim because he loved Rojas, not to kill the victim or inflict great bodily harm. In sum, counsel argued that defendant "just lost it" and "went crazy" when he saw his "loved one" having sex with the victim, and "he didn't know what he was doing."

¶ 48                                        E. Verdict

¶ 49    On March 12, 2020, the jury returned a verdict of guilty of first-degree murder. Defendant timely filed a motion for a judgment notwithstanding the verdict or motion for a new trial. He argued, *inter alia*, that the trial court erred in denying the second-degree murder instruction. On June 12, 2020, following argument, the trial court denied defendant's motion.

¶ 50                                        F. Sentencing

¶ 51    The case proceeded to a sentencing hearing on June 12, 2020. The State introduced body camera footage from the police officer who arrived first at the scene and approached the victim

just before he died. The State also submitted a printout of text messages between defendant and Giacomino and argued that they reflected an apparent effort by defendant to obtain a gun prior to the offense. The State further introduced the Elgin Industries surveillance video from the night of the murder. Defense counsel submitted letters from defendant's family and friends and argued that defendant had a minimal criminal history, including the domestic violence case, misdemeanor obstructing identification, consumption of liquor by a minor, and driving without a license. Defendant made a statement in allocution, describing his lack of intent to murder the victim, expressing his regret, and requesting forgiveness.

¶ 52    Following argument, the trial court sentenced defendant to 39 years' imprisonment. In reviewing the statutory factors in mitigation and aggravation, the trial court found that defendant "had led a law-abiding life for a substantial period of time before the commission of the present crime" and that defendant has a "very minimal criminal history, and I will give him credit for that." However, "[i]n looking at all the other factors and the factors that I have to consider in this case, I cannot find that any other factors in mitigation exist."

¶ 53    The trial court continued: "As far as the factors in aggravation, I would find that No. 7 applies, the sentence is necessary to deter others from committing the same crime. And No. 3, I will say I do not give full credit to. It slightly applies. He does have a criminal history of the domestic battery and the what I'll call fugitive from justice in relation to the immigration issue, although I do not put a lot of weight on that. The weight I am putting on my sentence today are the facts of this case. I do not find that any other factor in aggravation as outlined in the statute exist."

¶ 54    Regarding the facts of the case, the trial court noted that it heard the testimony, saw the videos, and read the text messages. The trial court found that the text messages suggested that defendant wanted to use a gun but did not have one. Moreover, defendant was the one who actually

did the stabbing. He was the "main perpetrator" and knew who the victim was and that the victim had been in a relationship with Rojas for a year. The trial court noted that it arguably would have been "more humane to put a bullet in his head as compared to stabbing him the number of times he did and leaving him half naked and bleeding, gasping so that you can't breathe and, literally having your life gurgle away from you while a police officer is attempting to do everything he can to save his life, and there is nothing he can do." In sum, the trial court stated that defendant "decided to arm himself with a knife *** and he decided to plunge the knife into a human body several times" in what amounted to "a premeditated assault." Accordingly, noting the 20 to 60-year sentencing range for first-degree murder, the trial court sentenced defendant to 39 years' imprisonment and announced a credit of 1032 days for time already served.

¶ 55    Defendant timely filed a motion to reconsider the sentence. Defendant argued that the sentence amounted to a *de facto* life sentence. Defendant also argued that the trial court failed to consider all factors in mitigation, including the costs of incarceration and that defendant is a father to two young children, acted under strong provocation, and is unlikely to commit another crime. On July 16, 2020, following argument, the trial court denied the motion to reconsider sentence. The trial court disagreed that the sentence amounted to a *de facto* life sentence and stated that it considered all factors in mitigation.

¶ 56    Defendant timely appealed.

¶ 57                                II. ANALYSIS

¶ 58    Defendant seeks reversal of his conviction and remand for a new trial on the basis that trial counsel provided ineffective assistance by knowingly opening the door to other-crimes evidence. Alternatively, defendant argues that his 39-year sentence was excessive and seeks reduction of the sentence or remand for resentencing. We address each argument in turn.

¶ 59                    A. Ineffective Assistance of Counsel

¶ 60    Defendant argues that trial counsel's decision to open the door to admission of defendant's prior domestic battery conviction and violations of the no-contact order as a means to obtain a second-degree murder instruction was unreasonable and that there is a reasonable probability that the result of the trial would have been different had the jury not been allowed to hear this evidence. The State counters that trial counsel's action was a matter of trial strategy and that, in any event, defendant failed to establish prejudice from the alleged deficient performance.

¶ 61    Ineffective-assistance-of-counsel claims are evaluated under the two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on an ineffective-assistance-of-counsel claim, a defendant must demonstrate that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced the defendant in that there is a reasonable probability that the result of the proceeding would have been different. *People v. Jackson*, 2020 IL 124112, ¶ 90. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Defense counsel has wide latitude in making tactical decisions, and there is a presumption that counsel's conduct was the product of sound trial strategy. *People v. Ramsey*, 239 Ill. 2d 342, 433 (2010). The defendant must satisfy both prongs under *Strickland*; thus, the failure to establish either is fatal to the claim. *Jackson*, 2020 IL 124112, ¶ 90.

¶ 62    Initially, the parties dispute whether the evidence would have been admissible regardless of trial counsel's conduct. Other-crimes evidence is not admissible merely to show the defendant's propensity to commit a crime. *People v. Placek*, 184 Ill. 2d 370, 385 (1998). However, evidence of uncharged crimes of domestic violence is admissible under section 115-7.4(a) of the Code of Criminal Procedure (725 ILCS 5/115-7.4(a) (2016)) and may be considered "for its bearing on any

matter to which it is relevant" in prosecutions for, *inter alia*, first-degree murder. Nevertheless, defendant argues, in determining the admissibility of the evidence, the trial court must still weigh the prejudicial impact of the evidence against its probative value based upon its proximity in time to the charged offense, the degree of factual similarity to the charged offense, or other relevant facts and circumstances. *Id.* § 115-7.4(b); *People v. Dabbs*, 239 Ill. 2d 277, 291 (2010).

¶ 63    According to defendant, where the facts of this case bore neither a connection nor factual similarity to the domestic battery conviction, the probative value of the domestic battery conviction was outweighed by its prejudicial effect. Thus, the evidence would not have been admissible under section 115-7.4. The State argues that, while it agreed not to introduce the prior conviction and no-contact order violations unless defendant opened the door to their admission, the evidence may in fact have been admissible under this statutory exception.

¶ 64    The point, however, is that, notwithstanding the State's agreement not to introduce the evidence, trial counsel affirmatively opened the door to admission of defendant's prior domestic battery conviction and repeated violations of the no-contact order by questioning defendant about his relationship with Rojas. Trial counsel elicited the testimony to support a second-degree murder instruction based on a sudden and intense passion after the discovery of marital infidelity. According to defendant, trial counsel's strategy was unreasonable because, under the facts of this case, established case law precluded the instruction.

¶ 65    A defendant is guilty of second-degree murder, rather than first-degree murder, if one of two mitigating factors is present. 720 ILCS 5/9-2(a) (West 2016); *People v. McDonald*, 2016 IL 118882, ¶ 59. The mitigating factor at issue in this case is where, at the time of the killing, the defendant acted under a "sudden and intense passion resulting from serious provocation" by the victim. 720 ILCS 5/9-2(a)(1) (West 2016). "Serious provocation" is "conduct sufficient to excite

an intense passion in a reasonable person." *Id.* § 5/9-2(b). A recognized category of serious provocation is adultery with the defendant's spouse. *McDonald*, 2016 IL 118882, ¶ 59.

¶ 66    However, defendant and Rojas were not legally married, and the adultery serious-provocation category has not been expanded beyond a legally recognized marriage. Rather, courts have declined to address the issue, where the instruction was not warranted on other grounds. See, *e.g.*, *People v. McCarthy*, 132 Ill. 2d 331, 340-42 (1989) (the relationship had ended two months prior to the murder); *People v. Yarbrough*, 269 Ill. App. 3d 96, 100-03 (1994) (the physical act at issue was criminal sexual assault, not adultery, and the defendant did not witness the sexual assault). In addition, defendant argues that the facts precluded any finding of "sudden and intense passion," where defendant had known about Rojas's relationship with the victim for a year prior to the murder. See *People v. Falls*, 235 Ill. App. 3d 558, 569 (1992) (no sudden and intense passion where the evidence established that the defendant knew about the affair for almost six months before the killing). Accordingly, defendant argues that trial counsel's performance was deficient.

¶ 67    The State argues that trial counsel's decision to pursue the instruction was strategic, even though ultimately unsuccessful, particularly given the overwhelming evidence against defendant. See *People v. Edmondson*, 2018 IL App (1st) 151381, ¶ 59 ("It suffices to say that any one of the available defense theories would have been a hard sell" in light of the overwhelming evidence and "[w]hich one(s) to argue was a matter best left to counsel's strategic judgment ***."); *People v. Labosette*, 236 Ill. App. 3d 846, 856 (1992) ("Given the number of eyewitnesses to this murder, defense counsel's one viable strategy was to urge a defense in an attempt to reduce the possible conviction from first[-]degree murder to second[-]degree murder."). Moreover, the State points out, trial counsel used the testimony at issue not just to pursue a second-degree murder instruction, but also to argue in closing that defendant lacked the requisite intent for first-degree murder.

¶ 68    Ultimately, however, we need not resolve whether trial counsel's performance was deficient because we may resolve defendant's ineffective-assistance-of-counsel claim on the prejudice prong alone. See *Jackson*, 2020 IL 124112, ¶ 91. Defendant admitted stabbing the victim and enlisting Gabriel and Giacomino to help him "beat the shit out of" the victim. Gabriel and Rodriguez testified that defendant hired Gabriel and Giacomino to beat up the victim and described their execution of the plan. They drove to the victim's place of employment, laid in wait, and then pulled the victim out of the car and beat him. Surveillance footage showed Rojas's Ford Explorer and Rodriguez's Buick Rendezvous at the scene, with defendant running to the Explorer and back to the Rendezvous. Giacomino's palm print was found on the Explorer. The victim's blood was found in the Rendezvous, where defendant was seated after the beating. Defendant texted Giacomino about going to go "hit" someone and asked if they were "ready" shortly before the murder. Later that day, Gabriel repeatedly texted defendant regarding the promised money. Surveillance showed defendant with Rojas in the checkout area of Walmart the day before the murder buying knives that fit the description of the murder weapon. Police recovered three of the knives in Rojas's house. Defendant stated that he threw the knife he wielded in the river. Accordingly, given the overwhelming evidence against defendant, there is no reasonable probability that the jury would have reached a different verdict had it not heard evidence about defendant's domestic battery conviction and violations of the no-contact order. Thus, defendant cannot establish his ineffective-assistance-of-counsel claim.

¶ 69                                  B. Sentencing

¶ 70    Defendant next contends that his 39-year sentence was excessive because he was only 29 years old at the time of the murder with a minimal criminal history. According to defendant, the sentence does not reflect his rehabilitative potential. The State responds that the trial court

expressly considered factors in mitigation and that the length of the sentence—21 years *under* the maximum allowable sentence—was well within the trial court's discretion given the facts of the case.

¶ 71    The trial court has wide discretionary powers in sentencing a defendant, and its sentencing decision is entitled to great deference. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). A sentence within the statutory limits will not be considered an abuse of discretion unless it is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (2000). In imposing a sentence, the trial court must balance relevant factors, such as the nature of the crime, the defendant's rehabilitative potential, and the protection of the public. *People v. Jones*, 2014 IL App (1st) 120927, ¶ 55. The most important sentencing factor is the seriousness of the offense; thus, the trial court is not required to give greater weight to mitigating factors than to the seriousness of the offense. *Id.* (citing *Alexander*, 239 Ill. 2d at 214).

¶ 72    Here, defendant was found guilty of first-degree murder, and the sentencing range was 20 to 60 years' imprisonment. See 730 ILCS 5/5-4.5-20(a)(1) (West 2016). Defendant received a 39-year sentence—well within the permissible statutory range. The trial court expressly considered defendant's minimal criminal history but found that the nature and circumstances of the crime warranted the sentence imposed. Specifically, the trial court noted that defendant "decided to arm himself with a knife *** and he decided to plunge the knife into a human body several times" in what amounted to "a premeditated assault."

¶ 73    Having reviewed the record, we cannot say that the trial court abused its discretion in sentencing defendant. Defendant paid two men to help him (in his own words) "beat the shit out of" the victim. The men dragged the victim out of a car; defendant ran over to join them in beating

the half-naked victim in a 3-on-1 assault. Defendant planned the incident, brought a knife, and used it to repeatedly stab the victim. The evidence established that the victim suffered multiple stab and incise wounds to his chest, back, buttocks, abdomen, arm, and wrist. The victim was bruised and beaten, with a shoe print on his face. He was left to bleed out and die. Under these facts, the 39-year sentence was well within the trial court's discretion.

¶ 74   Defendant maintains that the trial court failed to consider all evidence of his potential for rehabilitation, including that he has two young daughters, strong support from family and friends, and a steady employment history. However, the trial court is presumed to have considered all relevant factors and any mitigating evidence presented and is not obliged to "recite and assign a value to each factor." *People v. Williams*, 2019 IL App (1st) 173131, ¶ 21. The defendant bears of the burden of showing that the trial court did *not* consider the relevant factors. *Id.* ¶ 21. No such showing was made here. To the contrary, the trial court's decision reflects consideration of the statutory factors in mitigation and aggravation, and in denying defendant's motion to reconsider his sentence, the trial court explicitly stated that it considered all factors in mitigation.

¶ 75   As a final matter, defendant suggests that his 39-year sentence is improper because it amounts to a *de facto* life sentence, citing *People v. Buffer*, 2019 IL 122327. In *Buffer*, our supreme court held that a *juvenile* offender cannot be sentenced to a *de facto* life sentence of more than 40 years. *Id.* ¶¶ 40-41. However, defendant was not a juvenile; he was 29 years old when he murdered the victim. A lengthy prison sentence will not be found improper merely because it arguably amounts to a *de facto* life sentence, so long as it is not otherwise an abuse of discretion. *People v. Towns*, 2020 IL App (1st) 171145, ¶ 46. As set forth above, the trial court did not abuse its discretion in sentencing defendant. The trial court highlighted the circumstances and seriousness of the offense in sentencing defendant to 39 years' imprisonment. The sentence was 21 years below

the maximum allowance sentence. See 730 ILCS 5/5-4.5-20(a)(1) (West 2016). In sum, defendant fails to establish that his sentence was greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. See *Stacey*, 193 Ill. 2d at 210.

¶ 76                                    III. CONCLUSION

¶ 77    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 78    Affirmed.